IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ANTHONY CORDOVA,

               Plaintiff,                           OPINION and ORDER

    v.                                                 07-cv-172-bbc

JANET WALSH, Psychologist DS 1, DS1 first
shift sergeant, DR. JENS, Psychiatrist and
DR. DANA DIEDRICH, Psychiatrist,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In this civil action for monetary and injunctive relief brought under 42 U.S.C. § 1983, plaintiff Anthony Cordova contends that defendants Janet Walsh, Patricia Jens and Dana Diedrich violated his Eighth Amendment rights by refusing to provide him with mental health treatment while he was confined at the Columbia Correctional Institution. Now before the court is defendants' motion for summary judgment. Because plaintiff has failed to adduce evidence that defendants were deliberately indifferent to a serious medical need, defendants' motion for summary judgment will be granted.

I find the following facts to be material and undisputed.

1

UNDISPUTED FACTS

On May 2, 2006, plaintiff Anthony Cordova transferred from the Wisconsin Secure Program Facility to Columbia Correctional Institution. Plaintiff remained at the Columbia Correctional Institution until February 7, 2007, when he was transferred to the Waupun Correctional Institution.

At all times relevant to plaintiff's complaint, defendant Janet Walsh was a Psychologist Supervisor and defendants Dana Diedrich and Patricia Jens were psychiatrists at Columbia Correctional Institution.

Defendant Walsh never conducted any examinations or clinical interviews with plaintiff, although she did correspond with him in response to several written inquiries that he submitted to clinical staff under her supervision.

On May 3, 2006, Columbia Correctional Institution psychological staff reviewed plaintiff's clinical records. The review revealed that plaintiff had a suicidal history that included an attempt to hang himself on February 20, 2006, while he was confined at the Wisconsin Secure Program Facility. As a result of the file review, security staff placed in segregation and arranged for plaintiff to meet with psychology and psychiatry staff.

At Columbia Correctional Institution, inmates in segregation are seen regularly by psychology staff during cell-side rounds and may receive out-of cell appointments with psychiatrists. Upon arrival at the institution, plaintiff's mental health code was "MH-1."

2

He was diagnosed with adjustment and personality disorders. "MH-1" is a classification code that applies to inmates who are receiving mental health services but are not considered seriously mentally ill.

On May 4, 2006, Letitia Ley conducted a clinical interview with plaintiff. She noted that plaintiff's mental status was oriented to person, time and place, but not to situation; plaintiff stated he did not know the reason for his transfer to Columbia Correctional Institution. Ley developed a treatment plan that included consulting with the Psychological Services Unit clinician so that plaintiff could be assessed and monitored appropriately. On May 26, 2006, defendant Walsh reviewed and signed a document titled "Psychological Services Clinical Contact" that Ley prepared in connection with her May 4, 2006 clinical interview.

On May 8, 2006, Ley conducted another clinical interview with plaintiff. She noted that plaintiff's mental status was oriented, with organized thoughts, reasonably positive mood and a full range of affect. At the time of his meeting with Ley, plaintiff did not exhibit symptoms of a thought disorder, paranoid ideation, distraction by internal stimuli, mood disorder or anxiety disorder. Ley noted that since her last meeting with plaintiff, he now appeared to understand why he had been sent to Columbia Correctional Institution. Ley developed a treatment plan that included advising the Psychological Services Unit clinician and social worker of her interactions with plaintiff and requesting appropriate follow-up.

3

On May 23, 2006, defendant Walsh reviewed and signed another "Psychological Services Clinical Contact" completed by Ley in connection with her May 8, 2006 interview.

On May 17, 2006, plaintiff was seen by defendant Diedrich. Plaintiff showed good grooming and hygiene, had good eye contact and was cooperative and compliant. Defendant Diedrich developed a treatment plan that included a trial prescription of Zoloft (to treat depression and anxiety) and Trazodone (to treat insomnia), and recommended a followup with plaintiff in six weeks or sooner if the need arose.

On July 27, 2006, plaintiff was seen by defendant Jens. Plaintiff showed good eye contact, no abnormal movements, organized thoughts and did not appear grandiose, paranoid or delusional. Defendant Jens developed a treatment plan that included an increase to his prescription for Trazodone and continuation of Zoloft. Defendant Jens advised plaintiff that she would follow up with him in two months and if he needed to be seen sooner, he should submit a health services request form.

On August 18, 2006, a psychological associate referred plaintiff for a psychiatric evaluation with defendant Jens. On or about August 25, 2006, defendant Jens spoke to the security staff where plaintiff was housed. There were no suggestions that plaintiff was in any immediate danger. Defendant Jens wrote to plaintiff and advised him that she would see him at his next scheduled medication check.

On or about September 15, 2006, defendant Jens received a health service request

from plaintiff requesting a change in the dose of Amitriptyline (anti-depressant or mood elevator) he was taking. Defendant Jens changed the timing of the dose and discussed the change with doctor Suliene (who had prescribed the medication at the end of August 2006 for back pain).

On or about September 29, 2006, defendant Jens received a health services request from plaintiff requesting a change in timing of his "sleeping meds." Plaintiff wanted to take his "sleep meds" at noon. Defendant Jens asked plaintiff why he would want Trazodone (for sleep) at noon.

On October 10, 2006 at 3:33 p.m., plaintiff was placed on observation status in response to his thoughts of self-harm. He was evaluated by clinical staff at 3:50 p.m. On October 11, 2006 at 3:20 p.m., clinical staff attempted a follow-up evaluation of plaintiff while plaintiff was in observation status, but he would not respond to interview questions. On October 12, 2006 at 9:50 a.m., clinical staff conducted a follow-up evaluation of plaintiff while he was in observation status. He reported a belief that he might harm himself. On October 13, 2006 at 2:30 p.m., clinical staff conducted a follow-up evaluation of plaintiff while in observation status. He reported he was no longer experiencing suicidal ideation and was released from observation. During the time plaintiff was on observation status (October 10, 2006 a 3:33 p.m. through October 13, 2006 at 2:30 p.m.), he was monitored every 15 minutes by Columbia Correctional Institution staff.

5

On or about October 13, 2006, defendant Jens received a health services request from plaintiff, who stated that he was not taking his psychiatric medicine and did not want to follow up with her. Defendant Jens responded that she would schedule an appointment for him to give him an opportunity to discuss why he had stopped taking the medications and refused other treatment options.

On October 28, 2006 at 12:30 p.m., plaintiff was placed on observation status again because he made threats of self-harm. On October 30, 2006 at 2:45 p.m., plaintiff was released from observation status after an interview with clinical staff. During the time plaintiff was on observation status (October 28, 2006 a 12:30 p.m. through October 30, 2006 at 2:45 p.m.), he was monitored every 15 minutes by staff.

On November 16, 2006, plaintiff was seen by defendant Diedrich. Plaintiff advised defendant Diedrich that he did not want to continue taking any medication, including Trazodone and Zoloft, or engage in any treatment plan. Defendant Diedrich discontinued the prescriptions for Trazodone and Zoloft.

On November 22, 2006, plaintiff was seen by Ley to assess whether he was suicidal after he made another threat to harm himself. Plaintiff's mental status did not appear to represent immediate risk to himself or others. Ley developed a treatment plan that included her consultation with clinical staff regarding appropriate treatment and follow-up. On November 27, 2006, defendant Walsh reviewed and signed another "Psychological Services

6

Clinical Contact" completed by Ley in connection with her November 22, 2006 interview.

On January 3, 2007, defendant Diedrich met with plaintiff. Plaintiff showed fair grooming and hygiene, good eye contact and normal psychomotor activity. Defendant Diedrich developed a treatment plan that included a prescription trial of Celexa, and a plan to follow up with him in six weeks or sooner if the need arose.

On February 7, 2007, plaintiff transferred out of Columbia Correctional Institution and was received at Waupun Correctional Institution.

## OPINION

Plaintiff contends that defendants were deliberately indifferent to his mental health needs in violation of the Eighth Amendment. The Eighth Amendment affords prisoners a constitutional right to medical care. Snipes v. DeTella, 95 F. 3d 586, 590 (7th Cir. 1996) (citing Estelle v. Gamble, 429 U.S. 97, 103 (1976)). The standard for determining whether a prison official violates the Eighth Amendment in this setting is whether she is "deliberately indifferent" to a prisoner's "serious medical need." Estelle, 429 U.S. at 104-05.

A medical need may be serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering when treatment is withheld, Gutierrez v. Peters, 111 F.3d 1364, 13671-73 (7th Cir. 1997), "significantly affects an individual's daily activities," Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir.

7

1998), causes pain, Cooper v. Casey, 97 F.3d 914, 916-17 (7th Cir. 1996), or otherwise subjects the prisoner to a substantial risk of serious harm, Farmer v. Brennan, 511 U.S. 825 (1994). Both physical and mental illnesses may be "serious medical needs." Sanville v. McCaughtry, 266 F.3d 724, 734 (7th Cir. 2001) (citation omitted). Moreover, the need may be a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person, Johnson v. Snyder, 444 F.3d 579, 584 -85 (7th Cir. 2006). "Deliberate indifference" means that the officials were aware that the detainee needed medical treatment, but disregarded the risk by failing to take reasonable measures. Forbes v. Edgar, 112 F.3d 262, 266 (7th Cir. 1997).

Thus, under this standard, plaintiff's claim has three elements:

(1) Did plaintiff need mental health treatment?

(2) Did defendants know that plaintiff needed treatment?

(3) Despite their awareness of the need, did defendants fail to take reasonable measures to provide the necessary treatment?

The question at this stage of the litigation is whether plaintiff has adduced enough evidence to permit a reasonable jury to find that he has satisfied each of these elements with respect to each defendant. Borello v. Allison, 446 F.3d 742, 748 (7th Cir. 2006); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986).

8

1. Plaintiff's serious medical need

Defendants contend that plaintiff cannot show he has a serious medical need because he was determined to have only adjustment and personality disorders and was classified as "MH-1," suggesting that his medical needs are not "serious." However, plaintiff had a "suicidal history" including at least one serious suicide attempt. At the very least, when plaintiff began making threats of self-harm, a reasonable jury could conclude that plaintiff suffered from a condition which, if untreated, put him at a serious risk of physical harm. Therefore, plaintiff could show a "serious medical need" for treatment.

2. Defendants' awareness of the need for treatment

The next question is whether defendants knew of plaintiff's mental health care needs. Although defendants Jens and Diedrich treated plaintiff several times and defendant Walsh reviewed reports of their visits, there evidence is unclear whether defendants ever discovered that plaintiff was making threats of self-harm or displaying troubling symptoms. At every meeting they had with plaintiff, he appeared to be well. Although members of the "clinical staff" found out that plaintiff appeared suicidal on different occasions, it is not clear whether defendants were part of the clinical staff that found out. Nonetheless, viewing the facts in the light most favorable to plaintiffs, a reasonable jury could conclude that defendants were part of the "clinical staff" that knew about plaintiff's threats of self harm.

3. Defendants' response to the medical need

Although a reasonable juror could infer that defendants were part of the "clinical staff," plaintiff loses on the final question. A prison official is not "deliberately indifferent" so long as she has taken reasonable measures to provide the treatment necessary under the circumstances. Forbes, 112 F.3d at 266. A plaintiff alleging deliberate indifference who has received some medical care addressing his health care needs must show that the treatment he received was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate" plaintiff's serious medical condition. Snipes, 95 F.3d at 592. Mere disagreement with a doctor's medical judgment, Edwards v. Snyder, 478 F.3d 827, 831 (7th Cir. 2007), inadvertent error, negligence, malpractice or even gross negligence in providing treatment is insufficient to establish deliberate indifference. Washington v. LaPorte County Sheriff's Dept., 306 F.3d 515 (7th Cir. 2002).

The facts show that plaintiff received treatment for both his general mental health and for his threats of suicide. To address plaintiff's general mental health, staff at Columbia Correctional Institution visited him on several occasions: clinicians visited him at least eight times and psychiatrists visited him at least four times during his incarceration at the institution. Throughout, health care providers assessed his mental health and prescribed medicine related to his mental illness (except when he refused it). When plaintiff brought threats of self-harm to the attention of prison officials, he was placed in segregation and

10

monitored every 15 minutes until he was no longer considered unsafe. Because plaintiff received ongoing care and special attention when his suicide threats required it, no reasonable jury could find that defendants were deliberately indifferent to plaintiff's mental health care needs. Therefore, defendants' motion for summary judgment will be granted on plaintiff's claim that defendants violated his Eighth Amendment right to adequate medical care.

## ORDER

IT IS ORDERED that the motion for summary judgment (dkt. #55) filed by defendants Janet Walsh, Patricia Jens and Dana Diedrich on plaintiff Anthony Cordova's claim that defendants violated his Eighth Amendment rights is GRANTED. The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 6th day of May, 2008.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge

11